1                    UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NORTH CAROLINA
2                          EASTERN DIVISION

3

4   UNITED STATES OF AMERICA,     )
                                  )
5                                 )
                      PLAINTIFF,  )
6                                 )
              VS                  ) CASE NO. 4:13-CR-39-1-D
7                                 )
                                  )
8   JEFFREY LEVON WRIGHT,         )
                                  )
9                     DEFENDANT.  )

10

11

12

13                              MOTION HEARING

14                            JULY 22, 2013

15             CHIEF DISTRICT JUDGE JAMES C. DEVER III

16   APPEARANCES:

17       MR. SEAN EVANS
         ASSISTANT UNITED STATES ATTORNEY
18       310 NEW BERN AVENUE
         RALEIGH, NC   27601
19       (FOR THE GOVERNMENT)

20       MR. DAVID W. VENABLE
         ATTORNEY AT LAW
21       SUITE 310
         5 W. HARGETT STREET
22       RALEIGH, NC   27601
         (FOR THE DEFENDANT)

23

24

25   SHARON K. KROEGER, COURT REPORTER
     MACHINE SHORTHAND REPORTER, COMPUTER AIDED TRANSCRIPTION

1                          I N D E X

2                          WITNESSES

3     NAME                      DIRECT   CROSS   REDIRECT   RECROSS

4     MICHAEL HOWARD              3        6        11

5     ANNETTE DAVIS              14       20        26

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  GOOD MORNING.  WELCOME TO THE

2    UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF

3    NORTH CAROLINA.  WE ARE HERE FOR APPEAL IN A DETENTION

4    HEARING.

5          GOOD MORNING, MR. VENABLE.  ARE YOU AND MR.

6    WRIGHT READY TO PROCEED?

7          MR. VENABLE:  WE ARE.

8          THE COURT:  MR. EVANS, IS THE GOVERNMENT

9    READY?

10          MR. EVANS:  YES, YOUR HONOR.

11          THE COURT:  I HAVE REVIEWED JUDGE GATES' ORDER

12    AND REVIEWED THE INDICTMENT.  IT IS A PRESUMPTION CASE.

13          DOES THE GOVERNMENT WANT TO PUT ON ANY

14    EVIDENCE?

15          MR. EVANS:  YOUR HONOR, TASK FORCE OFFICER

16    HOWARD IS HERE.  I WOULD BE HAPPY TO PUT HIM ON TO GIVE

17    YOU A SUMMARY OF THE CASE, YOUR HONOR.

18          THE COURT:  OKAY.

19          MR. EVANS:  THANK YOU.

20          MICHAEL HOWARD, CALLED AS A WITNESS HAVING,
            HAVING BEEN FIRST DULY SWORN, ON HIS OATH,
21          TESTIFIED AS FOLLOWS:

22          THE COURT:  YOU MAY EXAMINE THE WITNESS.

23          MR. EVANS:  THANK YOU, YOUR HONOR.

24    DIRECT EXAMINATION BY MR. EVANS:

25    Q   AGENT HOWARD, GOOD MORNING, SIR.

1    A    GOOD MORNING.

2    Q    WERE YOU INVOLVED WITH THE INVESTIGATION OF JEFFREY

3    WRIGHT?

4    A    I WAS.

5    Q    CAN YOU IDENTIFY THAT INDIVIDUAL IN THE COURTROOM

6    TODAY?

7    A    YES.  HE IS SITTING TO THE RIGHT OF HIS DEFENSE

8    ATTORNEY HERE THE WHITE PINSTRIPED SUIT.

9    Q    AGENT HOWARD, CAN YOU SUMMARIZE THE INVESTIGATION OF

10   MR. WRIGHT TO THE COURT?

11   A    YES.  BASICALLY FEBRUARY OF 2012, THE DEA AGENTS

12   INTERVIEWED A C.I. THAT GAVE HISTORICAL INFORMATION THAT

13   HE HAD SOLD SEVERAL KILOS TO MR. WRIGHT DURING THE PERIOD

14   OF TIME BETWEEN ROUGHLY AROUND 2002 I THINK.  I AM NOT

15   SURE.  I THINK IT WAS 2000 AND 2002, DURING THAT TIME

16   FRAME.

17        PURSUANT --

18             THE COURT:  KILOS OF COCAINE?

19             THE WITNESS:  CORRECT.

20   Q    PURSUANT TO THAT, IN FEBRUARY OF 2013, WE UTILIZED A

21   C.I. TO MAKE CONTACT WITH MR. WRIGHT.  PRIOR TO THAT 2013

22   DATE, A FEW DAYS PRIOR, THE C.I. MADE RECORDED PHONE

23   CALLS AND ALSO HAD A RECORDED MEETING WITH MR. WRIGHT

24   WHERE THEY DISCUSSED A TRANSACTION FOR A KILO OF COCAINE

25   TO BE SOLD TO MR. WRIGHT.

1       ON FEBRUARY 11, 2013, WE SET UP A MEET WITH MR.

2    WRIGHT TO SELL HIM A KILO OF COCAINE.  THE C.I. MET MR.

3    WRIGHT AT THE HOOTER'S PARKING LOT IN GREENVILLE, NORTH

4    CAROLINA, AT WHICH TIME AS SOON AS THE C.I. PULLED UP,

5    MR. WRIGHT WALKED UP TO THE C.I. VEHICLE.

6       THE TRANSACTION TOOK PLACE.  THE C.I. HANDED THE

7    KILO OF COCAINE TO MR. WRIGHT.  HE PLACED IT IN HIS

8    WAISTBAND IN HIS PANTS AND WALKED OVER TO HIS TOYOTA

9    YARIS CAR THAT HE HAD THERE WITH HIM, PLACED THAT KILO UP

10   UNDERNEATH THE FRONT PASSENGER SEAT AND SHUT AND LOCKED

11   HIS VEHICLE, WHEN BOTH THE C.I. AND MR. WRIGHT WALKED

12   INSIDE THE RESTAURANT THERE AT THE RESTAURANT IN HOOTER'S

13   AND HAD SUPPER.

14       DURING THE TIME THEY HAD SUPPER, THEY CONTINUED TO

15   HAVE CONVERSATION ABOUT THE KILO TRANSACTION AND ONCE

16   THEY EXITED, BOTH SUBJECTS WERE TAKEN INTO CUSTODY AND

17   APPROACHED BY LAW ENFORCEMENT.

18       PURSUANT TO BOTH SUBJECTS BEING DETAINED, A SEARCH

19   OF MR. WRIGHT'S VEHICLE REVEALED THAT THE COCAINE WAS

20   LOCATED ON THE FRONT PASSENGER SEAT ALONG WITH A LOADED

21   HANDGUN THAT WAS ALSO LOCATED BETWEEN THE CENTER CONSOLE

22   AND THE SEAT AS WELL.

23   Q   AGENT HOWARD, YOU MENTIONED SOME HISTORICAL

24   INFORMATION THAT WAS OBTAINED IN FEBRUARY OF 2012.  WERE

25   THERE MULTIPLE SOURCES THAT INDICATED THAT MR. WRIGHT WAS

1    A COCAINE DEALER IN THE KILO AMOUNT AREA?

2    A   YES, THERE WAS.

3    Q   DO YOU HAVE MORE IMPORTANT EVENTS OR THAT YOU RECALL

4    FROM THE LAST DETENTION HEARING?

5    A   NO.

6              MR. EVANS:  NO FURTHER QUESTIONS, YOUR HONOR.

7              THE COURT:  CROSS-EXAMINATION.

8              MR. VENABLE:  THANK YOU, YOUR HONOR.

9    CROSS-EXAMINATION BY MR. VENABLE:

10   Q   GOOD MORNING, DETECTIVE HOWARD.

11   A   GOOD MORNING.

12   Q   THE CONFIDENTIAL INFORMANT YOU ARE REFERRING TO, IS

13   THAT A GRADY SWAIN JOYNER; IS THAT CORRECT?

14   A   I AM NOT 100 PERCENT SURE ON HIS NAME.

15   Q   DO YOU KNOW A STREET NAME FOR HIM?

16   A   NO, I DO NOT.

17   Q   DO YOU KNOW A FIRST NAME OR LAST NAME, ANY NAME

18   AT ALL?

19   A   AS I EXPLAINED THE LAST TIME, I WAS NOT THE CALLING

20   AGENT OF THAT PARTICULAR C.I., SO I WAS NOT 100 PERCENT

21   SURE ON HIS NAME.

22   Q   DID YOU MONITOR THE MEETINGS OR THE PHONE CALLS

23   WITH -- BETWEEN THE CONFIDENTIAL INFORMANT AND MR.

24   WRIGHT?

25   A   NO, I HAVE NOT.  I DID NOT MONITOR THOSE CALLS.

1    Q    DID YOU MONITOR ANY OF THE MEETINGS?  THERE WAS AN

2    INITIAL MEETING AT MR. WRIGHT'S CAR DEALERSHIP, CORRECT,

3    BETWEEN THE CONFIDENTIAL INFORMANT AND MR. WRIGHT?

4    A    THERE WAS.  I WAS NOT PRESENT FOR THAT MEETING ON

5    THAT DAY.

6    Q    WERE YOU MONITORING -- THAT WAS A RECORDED

7    CONVERSATION.  I THINK YOU MADE REFERENCE.  WERE YOU

8    MONITORING THE TRANSMISSION OR RECORDING OF THAT

9    CONVERSATION?

10   A    NO, I WAS NOT.  I WAS NOT PRESENT THAT DAY DURING

11   THAT PARTICULAR MEET WITH MR. WRIGHT.

12   Q    SO DID YOU -- HAVE YOU GONE BACK AND LISTENED TO THE

13   TAPE OF THAT MEETING?

14   A    NO, I HAVE NOT.

15   Q    ARE YOU AWARE THAT ON THE WAY BACK FROM THAT MEETING

16   THAT THE CONFIDENTIAL INFORMANT INFORMED THE OFFICERS

17   THAT HE WAS UNABLE TO SELL MR. WRIGHT ANY COCAINE?

18   A    COULD YOU REPEAT YOUR QUESTION?

19   Q    THAT ON THE WAY BACK FROM THE MEETING BETWEEN THE

20   CONFIDENTIAL INFORMANT AND MR. WRIGHT, THAT THE

21   CONFIDENTIAL INFORMANT TOLD THE OFFICERS THAT HE WAS

22   UNABLE TO BUY ANY COCAINE FROM MR. WRIGHT?

23        WERE YOU AWARE THAT THAT WAS THE STATEMENT MADE BY

24   HIM?

25   A    NO, I WAS NOT.

1    Q    WAS THE INITIAL GOAL OF THE CONFIDENTIAL INFORMANT TO

2    PURCHASE COCAINE FROM MR. WRIGHT?

3    A    NO, IT WAS NOT.  THE INITIAL GOAL THERE BEFORE WAS TO

4    CONDUCT A CONTROLLED REVERSAL WITH MR. WRIGHT BECAUSE

5    THAT WAS THE NORMAL NATURE OF HOW THEY CONDUCTED

6    BUSINESS.

7    Q    AND SO THE ACTUAL CONTROLLED DELIVERY THAT WAS ON

8    FEBRUARY 11, 2013, THAT TOOK PLACE AT THE HOOTER'S IN

9    GREENVILLE; IS THAT CORRECT?

10   A    THAT'S CORRECT.

11   Q    WERE YOU PRESENT DURING THAT OCCASION?

12   A    I WAS PRESENT.

13   Q    AND WERE YOU MONITORING THE CONVERSATION IN THAT TIME

14   PERIOD?

15   A    NO, I DID NOT HAVE THE KEL DEVICE LOCATED IN MY

16   VEHICLE WHERE I WAS MONITORING THIS CONVERSATION AS IT

17   WAS TAKING PLACE, NO.

18   Q    SO HAVE YOU GONE BACK AND LISTENED TO THE TAPE OR THE

19   CONVERSATION FROM THAT TRANSACTION?

20   A    NO, I HAVE NOT SPECIFICALLY.

21   Q    YOU TESTIFIED THAT THIS CONFIDENTIAL INFORMANT HAD

22   GIVEN YOU INFORMATION, SOME HISTORICAL INFORMATION ABOUT

23   DEALING WITH MR. WRIGHT IN KILOGRAMS OF COCAINE; CORRECT?

24   A    HE HAS NOT GIVEN ME SPECIFIC INFORMATION, BUT HE HAS

25   GIVEN AGENTS INVOLVED IN THE CASE INFORMATION.

1   Q    AND THIS INFORMATION WAS APPROXIMATELY 2000 OR 2002;

2   SO SOME AT LEAST 10 YEARS AGO?

3   A    YES, THAT'S CORRECT.

4   Q    YOU REFERENCE IN RESPONSE TO MR. EVANS THERE BEING

5   MULTIPLE SOURCES OF HISTORICAL INFORMATION ABOUT PRIOR

6   DEALS WITH MR. WRIGHT?

7   A    YES.

8   Q    ALL OF THOSE STATEMENTS WERE SOME APPROXIMATELY 7 TO

9   10 YEARS AGO AT LEAST AS WELL; IS THAT CORRECT?

10  A    THAT'S CORRECT.

11  Q    AT THE DEAL AT THE HOOTER'S ON FEBRUARY 11, THERE WAS

12  NO -- MR. WRIGHT DIDN'T BRING ANY MONEY TO THAT

13  TRANSACTION; CORRECT?

14  A    NO, HE DID NOT.

15  Q    AND THERE WAS -- AND NO MONEY WAS EXPECTED TO BE

16  COLLECTED AT THAT TRANSACTION?

17  A    THAT'S CORRECT.

18  Q    SO ESSENTIALLY THE CONFIDENTIAL INFORMANT WAS JUST

19  GIVING A FRONT TO MR. WRIGHT, A KILOGRAM OF COCAINE; IS

20  THAT CORRECT?

21  A    THAT'S CORRECT.

22  Q    NOW, AFTER THE -- AFTER MR. WRIGHT'S ARREST, HE

23  CONSENTED -- THERE WAS SOME SEARCH CONDUCTED BY LAW

24  ENFORCEMENT OFFICERS; IS THAT CORRECT?

25  A    CORRECT.

1    Q    GREENVILLE AUTO SALES, MR. WRIGHT GAVE CONSENT FOR

2    YOU TO SEARCH THAT LOCATION; CORRECT?

3    A    YES.

4    Q    AND THERE WERE NO LARGE AMOUNTS OF CURRENCY, NO

5    DRUGS, NO DRUG PARAPHERNALIA LOCATED AT THAT LOCATION;

6    CORRECT?

7    A    NO, THERE WASN'T.

8    Q    OFFICERS ALSO CONDUCTED A SEARCH ON FROG LEVEL ROAD

9    IN GREENVILLE; CORRECT?

10   A    CORRECT.

11   Q    THAT IS THE ADDRESS OF MS. TAMMY WRIGHT?

12   A    YES.

13   Q    MR. WRIGHT'S SEPARATED WIFE?

14   A    YES.

15   Q    THERE WAS NO DRUGS OR DRUG PARAPHERNALIA FOUND AT

16   THAT LOCATION; CORRECT?

17   A    THAT'S CORRECT.

18   Q    AND OFFICERS ALSO SEARCHED A HOME IN ROCKY MOUNT,

19   NORTH CAROLINA; CORRECT?

20   A    YES.

21   Q    THAT WAS WHERE MS. ANNETTE DAVIS, MR. WRIGHT'S

22   LIVE-IN FIANCE LIVES; IS THAT CORRECT?

23   A    THAT'S CORRECT.

24   Q    THERE WAS NO DRUGS FOUND AT THAT LOCATION EITHER;

25   CORRECT?

1   A    CORRECT.

2   Q    AND WERE YOU AWARE MR. WRIGHT -- YOU ARE AWARE OF THE

3   BUSINESS HE OWNS AND OPERATES, GREENVILLE AUTO SALES,

4   WITH HIS BROTHER IN GREENVILLE?

5   A    YES.

6   Q    YOU ARE AWARE THAT HE OWNS MULTIPLE RENTAL HOUSES

7   THAT HE RENTS OUT AT A BUSINESS AS WELL?

8   A    YES.

9   Q    YOU ARE AWARE THAT HE IS ALSO A LICENSED BAIL

10  BONDSMAN IN THE STATE OF NORTH CAROLINA?

11  A    YES.

12           MR. VENABLE:  MAY I HAVE JUST ONE MOMENT, YOUR

13  HONOR.

14           THE COURT:  YES.

15           MR. VENABLE:  THANK YOU.  NOTHING FURTHER.

16           THE COURT:  ANYTHING ELSE?

17           MR. EVANS:  JUST A COUPLE FOLLOW-UP QUESTIONS,

18  YOUR HONOR.

19  REDIRECT EXAMINATION BY MR. EVANS:

20  Q    AGENT HOWARD, MR. VENABLE ASKED YOU ABOUT A SEARCH

21  THAT WAS DONE AT A GREENVILLE CAR DEALERSHIP.  DO YOU

22  REMEMBER TESTIFYING ABOUT THAT AT THE LAST HEARING?

23  A    I DO.

24  Q    WAS THERE A K-9 SEARCH THAT WAS DONE AT THAT

25  LOCATION?

1    A    THERE WAS.

2    Q    ALTHOUGH NOTHING WAS RECOVERED, DID THE K-9 PROVIDE A

3    POSITIVE INDICATION?

4    A    YES, IN THE PARTICULAR AREA OF THE OFFICE AREA IN

5    WHICH MR. WRIGHT USED THERE OF THE BUSINESS.

6    Q    AND SPECIFICALLY ON THE LOCATION WHERE THE K-9

7    INDICATED, WHERE WAS THAT LOCATED IN THE DEALERSHIP?

8    A    IT WAS AROUND THE DESK AREA THERE THAT MR. WRIGHT

9    USED.

10   Q    MR. VENABLE ALSO INDICATED JUST A MINUTE AGO THAT THE

11   DEFENDANT WORKED WITH HIS BROTHER.  ARE YOU FAMILIAR WITH

12   THE IDENTITY OF HIS BROTHER?

13   A    YES.

14   Q    CAN YOU IDENTIFY THAT INDIVIDUAL FOR THE COURT?

15   A    HE IS SITTING BACK IN THE AUDIENCE HERE, THE SHAVED

16   HEAD FELLOW WITH THE POLO SHIRT.

17   Q    DOES HE HAVE A FEDERAL CONVICTION FOR NARCOTICS

18   TRAFFICKING?

19   A    HE DOES.

20   Q    WAS HE ON SUPERVISED RELEASE UNTIL ABOUT 2010 OR

21   2011?

22   A    THAT'S CORRECT.

23   Q    HE IS NO LONGER ON SUPERVISED RELEASE?

24   A    THAT'S CORRECT.

25   Q    HE AND HIS BROTHER ARE PARTNERS IN THAT AUTO

1    DEALERSHIP; IS THAT CORRECT?

2    A    YES.

3    Q    ARE THERE ANY OTHER PARTNERS IN THAT BUSINESS?

4    A    I BELIEVE HIS WIFE IS ALSO ON THE BUSINESS LICENSE AS

5    WELL, HIS EX-WIFE.

6    Q    DO YOU KNOW -- IF YOU DON'T KNOW, IT'S FINE -- ARE

7    THEY STILL MARRIED?

8    A    I AM NOT 100 PERCENT SURE IF THEY ARE DIVORCED, IF

9    IT'S FINAL.

10   Q    THAT IS NOT THE FEMALE THAT WAS BROUGHT FORWARD AS

11   THE POTENTIAL THIRD PARTY CUSTODIAN AT THE LAST HEARING?

12   A    THAT'S CORRECT.

13   Q    AND YOU ARE ALSO FAMILIAR WITH MULTIPLE -- IN EXCESS

14   OF 15, PERHAPS IN EXCESS OF 20, RENTAL PROPERTIES

15   INVOLVED WITH THE DEFENDANT?

16   A    YES.

17            MR. EVANS:  NOTHING FURTHER.

18            THE COURT:  ANYTHING ELSE?

19            MR. VENABLE:  NO FURTHER.

20            THE COURT:  THANK YOU, AGENT.  PLEASE WATCH

21   YOUR STEP.

22            ANY OTHER EVIDENCE FROM THE GOVERNMENT?

23            MR. EVANS:  NO, YOUR HONOR.  THAT IS THE

24   EVIDENCE OF THE GOVERNMENT.

25            THE COURT:  THANK YOU.  ANY EVIDENCE FROM THE

1    DEFENSE?

2              MR. VENABLE:  YES, YOUR HONOR.  WE WOULD CALL

3    MS. ANNETTE DAVIS, YOUR HONOR.

4              ANNETTE MICHELLE DAVIS, CALLED
               AS A WITNESS, HAVING BEEN FIRST DULY SWORN,
5              ON HER OATH, TESTIFIED AS FOLLOWS:

6              THE COURT:  YOU MAY EXAMINE THE WITNESS.

7              MR. VENABLE:  THANK YOU, YOUR HONOR.

8    DIRECT EXAMINATION BY MR. VENABLE:

9    Q    GOOD MORNING, MR. DAVIS.

10   A    GOOD MORNING.

11   Q    WOULD YOU JUST STATE YOUR FULL NAME FOR THE COURT

12   REPORTER AND THE COURT.

13   A    ANNETTE MICHELLE DAVIS.

14   Q    WHERE DO YOU LIVE, MS. DAVIS?

15   A    133 RED BARN LANE, ROCKY MOUNT, NORTH CAROLINA.

16   Q    DO YOU OWN THAT HOME OR RENT THAT HOME?

17   A    I RENT IT.

18   Q    WHO ELSE LIVES IN THAT HOME?

19   A    JEFFREY WRIGHT.

20   Q    ANYBODY ELSE?

21   A    NO.

22   Q    AND WHAT IS YOUR RELATION TO MR. WRIGHT?

23   A    HIS GIRLFRIEND.

24   Q    AND HOW LONG HAVE YOU ALL BEEN IN A RELATIONSHIP?

25   A    WE HAVE BEEN KNOWING EACH FOR EIGHT, BUT LIVING

1    TOGETHER FOR THREE.

2    Q    AND DO YOU WORK, MS. DAVIS?

3    A    YES, SIR.

4    Q    WHERE DO YOU WORK?

5    A    FRENSENIUS MEDICAL.  IT'S A DIALYSIS CENTER

6    RESPONSIBLE FOR STICKING NEEDLES, MAKINGS ROUNDS AND

7    CHARTS AND DOING LABS AND MAKING SURE MY PATIENTS GET ON

8    THE TRANSPLANT REFERRAL FOR TRANSPLANTS.

9    Q    WHAT IS YOUR TYPICAL WORK HOURS DURING THE REGULAR

10   WEEK?

11   A    MONDAY THROUGH FRIDAY FROM 7:30 TO 4:00 OR 4:30.

12   Q    WHERE IS FRENSENIUS MEDICAL?

13   A    750 ENGLISH ROAD IN ROCKY MOUNT.

14   Q    HOW FAR, APPROXIMATELY, IS THAT FROM YOUR HOUSE?

15   A    TEN MINUTES.

16   Q    HOW LONG HAVE YOU WORKED FOR FRENSENIUS MEDICAL?

17   A    NINE AND A HALF YEARS.

18   Q    OTHER THAN THE TIMES WHEN YOU ARE AT WORK AT

19   FRENSENIUS MEDICAL, ARE YOU OTHERWISE GENERALLY AROUND

20   THE HOUSE?

21   A    YES, SIR.

22   Q    NOT GONE EVERY WEEKEND OR YOU DON'T HAVE AN EVENING

23   JOB?

24   A    NO, SIR.

25   Q    DO YOU CURRENTLY HAVE A LAND TELEPHONE LINE?

1    A    NOT NOW; NO, SIR.

2    Q    WOULD YOU BE ABLE AND WILLING TO INSTALL A LAND

3    TELEPHONE LINE IF IT WAS NECESSARY?

4    A    YES, SIR.

5    Q    ALL RIGHT.  YOU AND I HAVE TALKED ABOUT THE POTENTIAL

6    OF YOU BEING A THIRD PARTY CUSTODIAN AND WHAT THAT WOULD

7    MEAN?

8    A    YES, SIR.

9    Q    AND DO YOU UNDERSTAND THAT IF THE COURT WERE TO ALLOW

10   YOU TO ACT AS A THIRD PARTY CUSTODIAN, YOU WOULD BE

11   OBLIGATED TO INFORM THE COURT IF MR. WRIGHT GOT IN

12   FURTHER TROUBLE.  DO YOU UNDERSTAND THAT?

13   A    YES, SIR.

14   Q    YOU ARE WILLING TO DO THAT?

15   A    YES, SIR.

16   Q    SAME THING IF MR. WRIGHT RAN OFF.  YOU WOULD BE

17   OBLIGATED TO CALL THE POLICE.  DO YOU UNDERSTAND THAT?

18   A    YES, SIR.

19   Q    ARE YOU WILLING TO DO THAT?

20   A    YES, SIR.

21   Q    ARE THERE ANY FIREARMS IN YOUR HOME?

22   A    NO.

23   Q    ARE THERE ANY ILLEGAL SUBSTANCES?

24   A    NO, SIR.

25   Q    YOU ARE FAMILIAR WITH MR. WRIGHT'S BUSINESS,

1   OBVIOUSLY, I ASSUME?

2   A   YES, SIR.

3   Q   YOU HEARD PRIOR TESTIMONY ABOUT THE AUTO LOT.

4   YOU ARE FAMILIAR WITH THAT?

5   A   YES, SIR.

6   Q   YOU ARE FAMILIAR WITH RENTAL PROPERTIES?

7   A   YES, SIR.

8   Q   ARE YOU FAMILIAR WITH MR. WRIGHT BEING A LICENSED

9   BAIL BONDSMAN?

10  A   YES, SIR.

11  Q   DURING THE COURSE OF HIS BAIL BONDING BUSINESS, HAVE

12  YOU KNOWN MR. WRIGHT TO CARRY A FIREARM?

13  A   YES, SIR.

14  Q   AND WHAT WAS YOUR UNDERSTANDING OF WHAT THE PURPOSE

15  OF THAT FIREARM WAS?

16  A   BECAUSE OF HIS BUSINESS, HIS JOB, BAIL BONDING.

17  Q   HAVE YOU EVER KNOWN HIM TO USE THE FIREARM AGAINST AN

18  INDIVIDUAL?

19  A   NO, SIR.

20  Q   HAVE YOU EVER HEARD OF ANY INSTANCE OF HIM USING A

21  FIREARM?

22  A   NO, SIR.

23  Q   MR. WRIGHT WAS ORIGINALLY ARRESTED ON FEBRUARY 11 AND

24  CHARGED IN STATE COURT IN PITT COUNTY; CORRECT?

25  A   YES, SIR.

1   Q   DO YOU KNOW ABOUT HOW LONG HE STAYED IN STATE COURT

2   CUSTODY?

3   A   HE WAS RELEASED ON APRIL 25, 2013.

4   Q   SO HE WAS IN ABOUT TWO MONTHS THEN?

5   A   YES.

6   Q   ROUGHLY?

7   A   YES.

8   Q   WHERE DID HE -- DID MR. WRIGHT GO TO WHEN HE WAS

9   RELEASED BACK AT 133 RED BARN LANE?  BACK TO THE HOUSE

10  YOU AND HE SHARED?

11  A   YES, SIR.

12  Q   HOW LONG WAS MR. WRIGHT OUT BEFORE HE WAS ARRESTED

13  AGAIN ON THE FEDERAL CHARGES?

14  A   THE EXACT DATE?  WHAT IS IT?  IT WAS LIKE -- IT WAS

15  LIKE JUNE.  IT WAS AROUND JUNE 16, 17, SOMEWHERE.

16  Q   SO A MONTH AND A HALF OR TWO MONTHS?

17  A   YES.

18  Q   DURING THAT TIME PERIOD, WHERE WAS MR. WRIGHT?

19  A   AT HOME.

20  Q   SO HE RETURNED HOME AND LIVED WITH YOU; CORRECT?

21  A   YES.

22  Q   AND WHEN HE LEFT, HE WAS WORKING AT THE GREENVILLE

23  AUTO LOT?

24  A   YES.

25  Q   DO YOU KNOW WHERE MR. WRIGHT WAS ARRESTED WHEN HE WAS

1    PICKED UP AND ARRESTED BY THE FEDERAL AGENTS?

2    A    YES, SIR.

3    Q    WHERE?

4    A    AT GREENVILLE AUTO SALES IN GREENVILLE.

5    Q    AND DO YOU KNOW MR. WRIGHT'S FAMILY, HIS IMMEDIATE

6    BROTHERS AND FAMILY?

7    A    YES, SIR.

8    Q    WHERE ARE THEY LOCATED?

9    A    IN GREENVILLE.

10   Q    AND DOES MR. WRIGHT HAVE CHILDREN?

11   A    YES, SIR.

12   Q    HOW OLD ARE THEY?

13   A    HE HAS ONE, I WANT TO SAY, ABOUT 13 OR 14.  HE HAD

14   ONE, LIKE BRANDON, I THINK, IS IN HIS 20'S.  HE IS LIKE

15   24.  AND THE YOUNGEST ONE IS LIKE, I WANT TO SAY, AROUND

16   10 OR SO.

17   Q    WHERE ARE THE YOUNGER ONES?

18   A    THEY LIVE WITH THEIR MOTHER.

19   Q    IN GREENVILLE?

20   A    GREENVILLE.

21           MR. VENABLE:  MAY I HAVE JUST ONE MOMENT?

22           THE COURT:  YOU MAY.

23           MR. VENABLE:  THANK YOU, MS. DAVIS.  NOTHING

24   FURTHER.

25           THE COURT:  ANY CROSS-EXAMINATION?

1          MR. EVANS:  YES, YOUR HONOR.  BRIEFLY.

2     THANK YOU.

3     CROSS-EXAMINATION BY MR. EVANS:

4     Q    MS. DAVIS, GOOD MORNING, AGAIN.

5     A    GOOD MORNING.

6     Q    YOU TESTIFIED A MINUTE AGO THAT YOU AND THE

7     DEFENDANT, PRIOR TO HIS ARREST ON FEDERAL, WERE LIVING AT

8     133 RED BARN LANE IN ROCKY MOUNT; IS THAT CORRECT?

9     A    YES, SIR.

10    Q    WHO OWNS THAT HOUSE?

11    A    JEFFREY WRIGHT.

12    Q    THAT IS HIS HOUSE?

13    A    YES, SIR.

14    Q    YOU INDICATED THAT YOU PAY RENT THERE; IS THAT

15    CORRECT?

16    A    I DO PAY PART OF THE BILLS.

17    Q    YOU DON'T PAY RENT; DO YOU?

18    A    NO.

19    Q    WHAT BILLS DO YOU PAY?

20    A    I AM RESPONSIBLE FOR THE UTILITIES.

21    Q    ARE THOSE IN YOUR NAME OR IN --

22    A    NO, THEY ARE HIS.

23    Q    HOW LONG HAVE YOU LIVED THERE AT THE RED BARN LANE

24    ADDRESS?

25    A    GOING ON TWO YEARS.

1    Q    YOU INDICATED A FEW MINUTES AGO THAT YOU AND THE

2    DEFENDANT HAD LIVED TOGETHER FOR THREE YEARS?

3    A    UM-HUM.

4    Q    WHERE DID YOU LIVE PRIOR TO THAT?

5    A    1228 CENTIPEDE DRIVE IN ROCKY MOUNT.

6    Q    WHO OWNED THAT HOUSE?

7    A    JEFFREY WRIGHT.

8    Q    AND WAS THAT A SIMILAR ARRANGEMENT THERE THAT YOU

9    STAYED THERE AND PAID SOME OF THE BILLS, BUT DIDN'T YOU

10   PAY RENT?

11   A    I PAID RENT THERE.

12   Q    HOW MUCH DID HE CHARGE YOU FOR RENT THERE?

13   A    IT WAS LIKE 750.

14   Q    750.  AND DURING THE THREE YEARS THAT YOU AND THE

15   DEFENDANT HAVE LIVED TOGETHER, HAS ANYONE ELSE LIVED WITH

16   YOU?

17   A    MY SON, BUT THEN HE GRADUATED.

18   Q    DOES HE STILL LIVE IN THE AREA OR HAS HE MOVED

19   ELSEWHERE?

20   A    MY SON?

21   Q    YES.

22   A    THEY MOVED ELSEWHERE.

23   Q    AND -- BUT WAS HE A MINOR AT THE TIME HE LIVED WITH

24   YOU?

25   A    YES.

1   Q   YOU INDICATED THAT YOU HAVE KNOWN THE DEFENDANT FOR

2   EIGHT YEARS; IS THAT CORRECT?

3   A   YES, SIR.

4   Q   HAVE YOU BEEN IN A DATING RELATIONSHIP WITH HIM FOR

5   THAT AMOUNT OF TIME?

6   A   NOT FOR THE WHOLE EIGHT YEARS.

7   Q   HOW DID YOU MEET?

8   A   WE WAS AT A RACE.

9   Q   WHAT KIND OF RACE; LIKE A NASCAR RACE?

10  A   YES.

11  Q   IN CHARLOTTE OR --

12  A   WE WAS IN ROXBORO.

13  Q   YOU INDICATED THAT YOU HAD WORKED AT THE SAME JOB FOR

14  THE PAST NINE AND A HALF YEARS?

15  A   YES.

16  Q   IF I PRONOUNCE IT WRONG, FORGIVE ME.  FRENSENIUS.

17  AND YOU WORK WITH DIALYSIS PATIENTS THERE; IS THAT

18  CORRECT?

19  A   YES, SIR.

20  Q   YOU INDICATED THAT YOU DON'T CURRENTLY HAVE A LAND

21  LINE; IS THAT CORRECT?

22  A   THAT'S CORRECT.

23  Q   YOU HAVE INDICATED THAT YOU ARE WILLING TO SERVE AS A

24  THIRD PARTY CUSTODIAN; IS THAT ALSO CORRECT?

25  A   YES.

1    Q    LET ME TALK TO YOU FOR A MINUTE.  THE LAST TIME YOU

2    TESTIFIED, YOU INDICATED THAT IT WAS QUITE COMMON FOR THE

3    DEFENDANT TO CARRY A GUN?

4    A    IT WAS WHAT?

5    Q    COMMON FOR THE DEFENDANT TO CARRY A GUN?

6    A    YES.

7    Q    IN FACT, DID YOU PRETTY MUCH TELL THAT HE ALMOST

8    ALWAYS CARRIED A GUN WITH HIM?

9    A    HE ALWAYS HAD ONE IN HIS CAR.

10   Q    BUT IT'S YOUR TESTIMONY HERE TODAY THAT THERE AREN'T

11   ANY FIREARMS IN HIS HOUSE THAT YOU CURRENTLY LIVE AT?

12   A    NO, THERE IS NONE IN THERE.

13   Q    YOU ALSO TESTIFIED THAT IF DURING THE DAY WHEN YOU

14   WEREN'T THERE, HE WOULD BE AT WORK?

15   A    YES, SIR.

16   Q    IS THAT CORRECT?

17   A    YES, SIR.

18   Q    YOU INDICATED THAT HE WOULD BE AT THE AUTO

19   DEALERSHIP?

20   A    YES.

21   Q    THE LAST TIME YOU TESTIFIED, YOU INDICATED THAT HE

22   WORKED THERE WITH HIS BROTHER KEVIN; IS THAT CORRECT?

23   A    YES, SIR.

24   Q    IN THE EIGHT YEARS YOU HAVE KNOWN THE DEFENDANT, HAVE

25   YOU EVER KNOWN HIM TO USE DRUGS?

1    A    NO, SIR.

2    Q    NEVER KNOWN HIM TO SMOKE MARIJUANA?

3    A    NO, SIR.

4    Q    NEVER KNOWN HIM TO SELL COCAINE?

5    A    NO, SIR.

6    Q    NEVER OVERHEARD HIM HAVE A CONVERSATION WITH ANYBODY

7    ABOUT SELLING DRUGS?

8    A    NO, SIR.

9    Q    DO YOU KNOW HIS BROTHER KEVIN WRIGHT?  DO YOU KNOW

10   HIM WELL?

11   A    YES, SIR.

12   Q    WERE YOU AWARE THAT HE HAS SERVED TIME FOR A FEDERAL

13   NARCOTICS TRAFFICKING VIOLATIONS?

14   A    YES, SIR.

15   Q    HOW LONG HAVE THEY OWNED THAT CAR DEALERSHIP

16   TOGETHER; DO YOU KNOW?

17   A    HIM AND HIS BROTHER KEVIN GOT EMPLOYED AFTER HE GOT

18   OUT, SO IT HAS BEEN ABOUT FOUR, MAYBE FIVE YEARS.

19   Q    IT'S AFTER KEVIN GOT OUT OF CUSTODY, THAT IS WHEN

20   THEY BOUGHT THE CAR DEALERSHIP?

21   A    JEFFREY ALREADY HAD IT.

22   Q    AND KEVIN BOUGHT INTO IT?

23   A    HE GOT ON BOARD.  I KNOW HE HIRED HIM AS AN EMPLOYEE

24   THEN.

25   Q    HOW LONG HAS THE DEFENDANT BEEN A BAIL BONDSMAN;

1   DO YOU KNOW?

2   A    EVER SINCE I HAVE BEEN KNOWING HIM AND I KNOW WE HAD

3   TALKED ABOUT IT BECAUSE IT HAD BEEN ABOUT 17 OR 18 YEARS.

4   Q    LAST TIME YOU TESTIFIED, I ASKED YOU SOME QUESTIONS

5   ABOUT THE RENTAL PROPERTIES THAT HE OWNED AND THERE WERE

6   OVER 20 OF THEM.  DO YOU RECALL THAT?

7        AND AT THAT TIME, YOU WEREN'T FAMILIAR WITH ALL

8   THOSE PROPERTIES.  IS THAT FAIR TO SAY THAT YOU DIDN'T

9   KNOW ABOUT ALL THE DIFFERENT PLACES THAT HE OWNED?

10  A    CORRECT.

11  Q    BUT YOU DO KNOW ABOUT THE TWO THAT YOU HAVE LIVED AT;

12  CORRECT?

13  A    YES, SIR.

14  Q    AND THE ONE THAT HIS EX-WIFE OR SEPARATED WIFE AND

15  THE KIDS LIVE AT?

16  A    THAT'S CORRECT.

17  Q    HOW MANY OTHER RENTAL PROPERTIES DO YOU KNOW ABOUT OR

18  DID YOU KNOW ABOUT?

19  A    I KNOW ABOUT ONE ON BERMUDA, THE TWO ON CENTIPEDE --

20  WELL, THREE ON CENTIPEDE, ONE ON BERMUDA.  NOW, THOSE ARE

21  ROCKY MOUNT.  BUT THE ONES IN GREENVILLE, I AM NOT REALLY

22  FAMILIAR WITH THE ONES IN GREENVILLE.

23            MR. EVANS:  CAN I HAVE JUST A MOMENT, YOUR

24  HONOR?

25            THE COURT:  YOU MAY.

1          MR. EVANS:  NOTHING FURTHER, YOUR HONOR.

2  THANK YOU.

3          THE COURT:  ANYTHING ELSE, MR. VENABLE?

4          MR. VENABLE:  BRIEFLY.

5  REDIRECT EXAMINATION BY MR. VENABLE:

6  Q   MS. DAVIS, THE RENTAL PROPERTY BUSINESS THAT MR.

7  WRIGHT RUNS OR OWNS, ARE YOU INVOLVED IN THE -- IN THAT

8  AT ALL?

9  A   NO MORE THAN I HELP PAINT THEM AND CLEAN THEM.

10  Q   DO YOU KNOW WHO MR. WRIGHT'S PARTNER IS IN THAT

11  BUSINESS?

12  A   YES.

13  Q   WHO IS THAT?

14  A   HIS WIFE.

15  A   TANYA WRIGHT?

16  A   YES.

17  Q   WHO HANDLES MOST OF THE DAY-TO-DAY OR ADMINISTRATIVE?

18  A   TANYA.

19  Q   AND THEN THE -- YOUR HOUSE AT RED BARN LANE IS ONE OF

20  THE HOMES SEARCHED BY LAW ENFORCEMENT OFFICERS; CORRECT?

21  A   CORRECT.

22  Q   AND, I GUESS, DID OFFICERS SEARCH FOR FIREARMS AT

23  THAT TIME?

24  A   YES.

25  Q   DID THEY REMOVE ANY FIREARMS THAT WERE IN THE HOUSE?

```
1    A   YES, SIR.

2              MR. VENABLE:  THAT'S ALL.  NOTHING FURTHER.

3    THANK YOU.

4              THE COURT:  THANK YOU.  ANYTHING ELSE?

5              MR. EVANS:  NO, YOUR HONOR.  THANK YOU.

6              THE COURT:  MS. DAVIS, PLEASE WATCH YOUR STEP

7    STEPPING DOWN.

8              ALL RIGHT.  ANY OTHER EVIDENCE FROM THE

9    DEFENSE?

10             MR. VENABLE:  NOTHING FURTHER FOR MR. WRIGHT.

11             THE COURT:  ALL RIGHT.  I WILL HEAR ARGUMENT

12   FROM MR. EVANS AND THEN I WILL HEAR FROM MR. VENABLE.

13             MR. EVANS:  YOUR HONOR, THE GOVERNMENT'S

14   ARGUMENT IS MUCH THE SAME AS IT WAS PREVIOUSLY AT THE

15   MAGISTRATE LEVEL.  THE GOVERNMENT'S PRIMARY CONCERN --

16   THE EVIDENCE IN THIS CASE FROM THE GOVERNMENT'S

17   PERSPECTIVE IS QUITE STRONG.

18             THERE WERE RECORDED MEETINGS, RECORDED

19   CONVERSATIONS MADE IN WHICH THE DEFENDANT AND THE

20   CONFIDENTIAL SOURCE DISCUSSED THE DEFENDANT AND ACQUIRING

21   A SIGNIFICANT QUANTITY OF COCAINE, THAT BEING A KILOGRAM

22   OF COCAINE.

23             THE TRANSACTION IS WELL DOCUMENTED.  THERE

24   WERE MULTIPLE AGENTS THERE AT THE TIME IT OCCURRED AT THE

25   HOOTER'S PARKING LOT.  THERE WERE MULTIPLE WITNESSES THAT
```

1    OBSERVED IT.

2          FOLLOWING THAT, THE CONFIDENTIAL SOURCE AND

3    THE DEFENDANT HAD A MEAL AT THAT RESTAURANT, CONTINUED TO

4    TALK ABOUT DRUG TRANSACTIONS.  AFTERWARDS, THEY WERE BOTH

5    TAKEN DOWN.

6          WHAT CONCERNS THE GOVERNMENT FOREMOST ABOUT IT

7    IS THAT THE DEFENDANT BROUGHT A LOADED FIREARM TO THE

8    DRUG TRANSACTION THAT WAS LOCATED WITHIN FEET OF WHERE

9    THE COCAINE WAS STORED IN HIS CAR AFTER HE TOOK IT OUT OF

10   HIS PANTS AND PLACED IT IN THE VEHICLE PRIOR TO GOING

11   INTO THE RESTAURANT.

12          THE DEFENDANT'S GUN WAS LOADED AND WAS IN A

13   LOCATION WHERE HE WOULD HAVE EASY ACCESS TO IT SHOULD

14   THAT COME UP.

15          YOUR HONOR, JUDGE GATES NOTED THIS AT THE

16   PREVIOUS HEARING.  THIS IS AN INDIVIDUAL WHO HAS

17   SIGNIFICANT ASSETS, SIGNIFICANT RENTAL PROPERTIES AND

18   INTEREST IN A BUSINESS AND AUTOMOTIVE DEALERSHIP, AND

19   ALSO A BAIL BONDSMAN, AND SOMEONE WHO IS PARTICIPATING IN

20   A TRANSACTION INVOLVING A KILOGRAM OF COCAINE IN WHICH

21   THAT AMOUNT OF DRUGS IS FRONTED TO SOMEBODY.

22          THEY HAVE TO HAVE A WAY OF GETTING RID OF

23   THAT.  THEY HAVE TO BE CONNECTED TO THE DRUG TRANSACTION

24   BUSINESS.  YOU ARE NOT GOING TO ORDER UP A SIGNIFICANT

25   AMOUNT OF COCAINE UNLESS YOU HAVE OTHER PEOPLE TO SELL IT

1    TO AT A PROFIT, PRESUMABLY.

2           JUDGE GATES STATED WHEN RENDERING HIS DECISION

3    THAT THIS IS SOMEBODY WHO DESPITE ALL APPEARANCES OF

4    HAVING ALL THESE PROFITABLE, LEGITIMATE BUSINESSES, WAS

5    WILLING TO TAKE THAT CHANCE AND DEAL IN THOSE DRUGS.

6           AND BASED ON THAT, HE FOUND THAT THERE WAS A

7    DANGER TO SOCIETY THAT IS PRESENT THERE.

8           I AM GOING TO TAKE THAT A STEP FURTHER, YOUR

9    HONOR.  YOU HEARD DEFENSE COUNSEL INDICATE THAT THEY

10    BELIEVE THEY HAVE IDENTIFIED THE PERSON WHO SERVED AS

11    POTENTIALLY AS THE CONFIDENTIAL SOURCE IN THIS CASE.  HE

12    ASKED THE AGENT ON THE STAND IF IT WAS A SPECIFIC

13    INDIVIDUAL.  THE AGENT INDICATED HE DIDN'T HAVE THAT

14    INFORMATION AS HE WASN'T INVOLVED IN THAT PART OF THE

15    CASE.  BUT IT APPEARS TO THE GOVERNMENT, YOUR HONOR, THAT

16    THEY POSSIBLY HAVE IDENTIFIED THIS INDIVIDUAL.

17           I THINK THERE IS A RISK INHERENT IN THAT AND

18    THERE IS ALSO INHERENT DANGEROUSNESS IN THE AMOUNT OF

19    DRUGS THAT WERE -- THAT CHANGED HANDS IN THIS

20    TRANSACTION.

21           IN ADDITION TO THAT, YOUR HONOR, I THINK YOU

22    CAN CONSIDER THE HISTORICAL INFORMATION.  ALBEIT, IT DOES

23    HAVE SOME AGE, THERE ARE MULTIPLE SOURCES WHO IDENTIFIED

24    THIS DEFENDANT AS SOMEBODY WHO TRAFFICKS COCAINE AT THE

25    KILOGRAM LEVEL OR GREATER.

1          FOR THOSE REASONS, YOUR HONOR, IT'S THE

2     GOVERNMENT'S POSITION THAT MR. WRIGHT REMAINS A DANGER TO

3     SOCIETY AND SHOULD BE DETAINED UNTIL THE CONCLUSION OF

4     THIS FEDERAL MATTER.  THANK YOU.

5          THE COURT:  THANK YOU.  MR. VENABLE.

6          MR. VENABLE:  THANK YOU, YOUR HONOR.

7          YOUR HONOR, WE SUBMIT TO YOU THAT ESSENTIALLY

8     WHAT YOU HAVE IS YOU HAVE A CONFIDENTIAL INFORMANT WHO

9     HAS KNOWN MR. WRIGHT FOR A LONG TIME, SO I DON'T THINK

10    IT'S ANY BIG DEAL THAT HE KNOWS THE NAME OR KNOWS WHO IT

11    IS THAT WENT ON A FISHING EXPEDITION AND WENT TO TALK TO

12    MR. WRIGHT AND TOOK MR. WRIGHT INTO SELLING DRUGS, AND IT

13    TURNED INTO A REVERSE THAT THEY WERE GOING TO SUPPLY

14    DRUGS.

15          AND INTERESTING ENOUGH, THERE WAS NO MONEY

16    COLLECTED.  THEY WERE SO ANXIOUS TO DO IT, THEY GAVE THE

17    COCAINE WITHOUT COLLECTING MONEY OR TALKING ABOUT THAT OR

18    ANYTHING.

19          BUT GOING BACK TO MR. WRIGHT PERSONALLY, HE IS

20    44 YEARS OLD.  HE HAS NO PRIOR CRIMINAL RECORD.  HE WAS

21    HONORABLY DISCHARGED FROM THE UNITED STATES MARINE CORPS.

22    HE IS HARD WORKING.  HE RUNS THREE DIFFERENT BUSINESSES:

23    THE AUTO SALES BUSINESS, THE RENTAL BUSINESS AND THE BAIL

24    BONDING BUSINESS.  HIS FAMILY IS IN THE AREA.

25          THERE IS, YOU KNOW, UNTIL WE COME UPON THIS,

1    HE IS IN GOOD SHAPE.  THERE IS SOME HISTORICAL

2    INFORMATION OUT THERE, BUT AGAIN, ALL THAT INFORMATION,

3    WE KNOW FROM THE TESTIMONY INDICATES IT WAS SOME SEVEN TO

4    TEN YEARS OLD.  THERE IS NO INDICATION THAT THERE WAS ANY

5    CURRENT ACTIVITY OTHER THAN THIS LONG TIME ACQUAINTANCE

6    COMING UP TO HIM AND ARRANGING THIS INSTANCE.

7              THE FIREARM, I WOULD REPRESENT TO YOU, IS NOT

8    RELATED, OR SUBMIT TO YOU WAS NOT RELATED TO THIS

9    OFFENSE.  IT'S IN THE CAR.  MS. DAVIS TESTIFIED HE ALWAYS

10   CARRIED ONE IN THE CAR RELATING TO THE BAIL BONDING

11   BUSINESS.  THERE IS NO TESTIMONY THAT THE FIREARM -- THAT

12   MR. WRIGHT EVER HAD THE FIREARM ON HIM PERSONALLY WHEN HE

13   WAS DEALING WITH THE CONFIDENTIAL INFORMANT, BE IT AT THE

14   CAR LOT OR AT THE HOOTER'S.  NO INFORMATION HE TOOK IT

15   INTO THERE, INTO THE HOOTER'S RESTAURANT AT THAT TIME.

16             IT'S SIMPLY INCIDENTAL TO THE BAIL

17   BONDING BUSINESS.  BUT I WOULD RESPECTFULLY SUBMIT THAT

18   DOESN'T INDICATE DANGEROUSNESS WITH RESPECT TO THIS.

19             YOU HEARD FROM MS. DAVIS.  SHE IS A HARD

20   WORKING LADY HERSELF.  THEY LIVED TOGETHER FOR THREE

21   YEARS.  THEY HAVE A RESIDENCE THAT MR. WRIGHT CAN RETURN

22   TO.  THEY ARE WILLING TO INSTALL A LAND LINE, WHICH I

23   SUBMIT YOUR HONOR COULD USE IF YOUR HONOR WANTED TO

24   IMPOSE ELECTRONIC HOUSE ARREST AS PART OF THIS SYSTEM.

25             AND I WILL TELL YOU, MR. WRIGHT HAD A

1    SUGGESTION IN TERMS OF HE IS WILLING TO HAVE ADT OR SOME

2    OTHER COMPANY COME OUT AND INSTALL A SYSTEM AND A

3    PROBATION OFFICER PROVIDED WITH WHATEVER CODES THEY WOULD

4    NEED TO MAKE SURE HE IS STILL IN THE HOUSE.  THAT IS

5    SOMETHING I NEVER ENCOUNTERED, BUT FOUND IT INTERESTING

6    THAT IT'S ONE THEY ARE WILLING TO DO.

7            I WOULD SUGGEST TO YOUR HONOR THAT HE IS NOT A

8    FLIGHT RISK.  HIS FAMILY IS HERE.  ALL HIS PROPERTY IS

9    HERE.  ALL HIS PROPERTIES ARE HERE.

10           THERE IS SIMPLY NO HISTORY OF ANY VIOLENCE OR

11   ANY DANGER.  I WOULD SUBMIT TO YOUR HONOR THAT THERE ARE

12   CONDITIONS THAT COULD BE SET THAT ALLOW HIM TO BE

13   RELEASED THAT WOULD ENSURE -- CERTAINLY THERE IS NO OTHER

14   FUTURE CONDUCT OR SIMILAR CONDUCT THAT WOULD ENSURE THE

15   SAFETY OF THE COMMUNITY AND OTHERS.

16           THE COURT:  THANK YOU.  ALL RIGHT.  THE COURT

17   HAS CONSIDERED THE ENTIRE RECORD.  THE COURT HAS

18   CONSIDERED THE TESTIMONY OF AGENT HOWARD AND MS. DAVIS.

19   UNDER 18 U.S.C. SECTION 3142(G) THE COURT IS TO CONSIDER

20   WHETHER THE GOVERNMENT HAS MET ITS BURDEN THAT THE

21   DEFENDANT WILL ENDANGER THE SAFETY OF OTHER PERSONS OR

22   THE COMMUNITY.  THE GOVERNMENT'S ARGUMENT DID NOT FOCUS

23   ON THE RISK OF NON-APPEARANCE.

24           JUDGE GATES' DETENTION ORDER FOCUSED ON DANGER

25   TO THE COMMUNITY.  THE COURT WILL FOCUS ON THAT.  THE

FACTORS TO CONSIDER INCLUDE THE NATURE AND CIRCUMSTANCES
OF THE OFFENSE, INCLUDING WHETHER THE OFFENSE IS A CRIME
OF VIOLENCE OR INVOLVES A NARCOTIC DRUG, THE WEIGHT OF
THE EVIDENCE AGAINST THE PERSON, THE HISTORY AND
CHARACTERISTICS OF THE PERSON, INCLUDING THE PERSON'S
CHARACTER, FAMILY TIES AND EMPLOYMENT, COMMUNITY HISTORY
RELATING TO DRUG AND ALCOHOL ABUSE, CRIMINAL HISTORY
RECORD CONCERNING COURT APPEARANCES, WHETHER OR NOT AT
THE TIME OF THE OFFENSE THE PERSON WAS ON PROBATION OR
PAROLE OR OTHER RELEASE, THE NATURE AND SERIOUSNESS OF
THE DANGER TO ANY PERSON OR THE COMMUNITY POSED BY THE
PERSON'S RELEASE.

          THE DEFENDANT WAS INDICTED FEDERALLY ON JUNE
4, 2013, CHARGED WITH POSSESSION WITH INTENT TO
DISTRIBUTE 500 GRAMS OR MORE OF COCAINE IN COUNT 1.
COUNT 2 CHARGES THAT ON OR ABOUT FEBRUARY 11, 2013, IN
THE EASTERN DISTRICT OF NORTH CAROLINA, THE DEFENDANT DID
KNOWINGLY POSSESS A FIREARM IN FURTHERANCE OF A DRUG
TRAFFICKING CRIME FOR WHICH HE MAY BE PROSECUTED IN A
COURT OF THE UNITED STATES AS ALLEGED IN COUNT 1 IN
VIOLATION OF 18 U.S.C. SECTION 924(C)(1)(A).

          THE CHARGED OFFENSE IN COUNT 1 CREATES A
REBUTTABLE PRESUMPTION.

          THE COURT DOES FIND THAT THE WEIGHT OF THE
EVIDENCE AGAINST MR. WRIGHT CERTAINLY, I THINK, CLEARLY

AS TO COUNT 1 IS VERY STRONG.  THERE WAS A RECORDED

TELEPHONE CONVERSATION WITH A CONFIDENTIAL SOURCE ABOUT

THE KILOGRAM OF POWDER COCAINE TO THE DEFENDANT FOR

DISTRIBUTION.  THE COCAINE WAS TO BE FRONTED.  THAT IS,

TO BE NOT PAID FOR BY THE DEFENDANT AT THE TIME OF THE

DELIVERY, BUT OUT OF THE PROCEEDS OF THE SALE.

THE DEFENDANT AND THIS WITNESS AS WITNESSED BY

LAW ENFORCEMENT AND AS RECORDED, AS I UNDERSTAND THE

TESTIMONY, RECEIVED THE COCAINE IN THE HOOTER'S PARKING

LOT, PUT THE COCAINE IN HIS WAISTBAND, WENT TO HIS CAR,

PUT IT UNDER HIS SEAT.  LOCKED THE CAR.  THE TWO THEN

WENT INTO THE RESTAURANT AND ATE.

AGAIN, THESE CONVERSATIONS CONTINUED TO BE

RECORDED.  BOTH WERE DETAINED AFTER EXITING THE

RESTAURANT.  THERE WAS A LOADED HANDGUN IN THE FRONT SEAT

OF HIS CAR, NEAR WHERE HE PLACED THE COCAINE.  THE

KILOGRAM OF COCAINE HAD A LARGE STREET VALUE.

THERE IS HISTORICAL INFORMATION FROM THE

CONFIDENTIAL SOURCE AND OTHERS THAT THE DEFENDANT HAS

BEEN INVOLVED IN TRAFFICKING COCAINE, ALBEIT THE

INFORMATION RELATES TO CONDUCT THAT TOOK PLACE SOME YEARS

AGO.

THE DEFENDANT WAS A BAIL BONDSMAN AT THE TIME

OF THE TRANSACTION, AND ACCORDING TO THE TESTIMONY FROM

MS. DAVIS, CARRIED A WEAPON AS A RESULT OF HIS DUTIES AS

1    A BAIL BONDSMAN.

2              THE COURT DOES THINK THAT THE PRESUMPTION HAS

3    BEEN REBUTTED BASED ON THE EVIDENCE PRESENTED THROUGH MS.

4    DAVIS.  THE COURT HAS CONSIDERED THE STRONG WEIGHT OF THE

5    EVIDENCE AGAINST THE DEFENDANT.

6              THE COURT ALSO HAS TAKEN INTO CONSIDERATION

7    HIS FAMILY TIES, HIS EMPLOYMENT, COMMUNITY TIES, ABSENCE

8    OF A CRIMINAL HISTORY.

9              THE COURT DOES NOTE THAT IT'S CONCERNED THAT

10   MS. DAVIS IS -- HAS BEEN LONG EMPLOYED AND IS NOT THERE

11   FOR A GOOD BIT OF THE DAY.

12             THE COURT HAS CONSIDERED THE MITIGATING

13   FACTORS ASSOCIATED WITH THE ABSENCE OF A CRIMINAL RECORD,

14   AND HIS OWN EMPLOYMENT, HIS MILITARY DISCHARGE, ABSENCE

15   OF HISTORY RELATED TO DRUG OR ALCOHOL ABUSE.

16             NONETHELESS, AS JUDGE GATES DISCUSSED IN HIS

17   ORDER AND IN COURT, THE WEIGHT OF THE EVIDENCE IS QUITE

18   STRONG.  THE DEFENDANT OBVIOUSLY WAS COMFORTABLE DOING

19   THIS TRANSACTION AND BEING ABLE TO REDISTRIBUTE THIS

20   LARGE AMOUNT OF COCAINE.

21             THUS, THE COURT DOES FIND THAT THE GOVERNMENT

22   HAS MET ITS BURDEN AND JUDGE GATES' DECISION IS AFFIRMED.

23             THE DEFENDANT WILL BE REMANDED TO THE CUSTODY

24   OF THE ATTORNEY GENERAL OF THE U.S. MARSHAL.  THE

25   DEFENDANT WILL CONTINUE TO HAVE ACCESS TO CONSULT WITH

1   COUNSEL AS HE PREPARES HIS CASE.

2               ANYTHING ELSE FROM THE GOVERNMENT?

3               MR. EVANS:  NO, YOUR HONOR.

4               THE COURT:  ANYTHING ELSE FROM THE DEFENSE?

5               MR. VENABLE:  NO, YOUR HONOR.  THANK YOU.

6               THE COURT:  I DO THANK COUNSEL.  THAT WILL

7   CONCLUDE THE MATTER INVOLVING THIS CASE.  WE WILL BE IN

8   RECESS.

9               (WHEREUPON, THE PROCEEDINGS WERE ADJOURNED.)

10

11

12                         CERTIFICATE

13

14          THIS IS TO CERTIFY THAT THE FOREGOING

15   TRANSCRIPT OF PROCEEDINGS TAKEN IN THE UNITED STATES

16   DISTRICT COURT IS A TRUE AND ACCURATE TRANSCRIPTION OF

17   THE SHORTHAND NOTES OF THE PROCEEDINGS TAKEN BY ME IN

18   MACHINE SHORTHAND AND TRANSCRIBED BY COMPUTER UNDER MY

19   SUPERVISION.

20               DATED THIS 14TH DAY OF MAY, 2014.

21

22

23                              /S/ SHARON K. KROEGER
                                COURT REPORTER

24

25